UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ERSIN DEGER, | : | Case No. 1:14-cv-420 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| UNIVERSITY OF CINCINNATI, | : | |
| CLERMONT COLLEGE, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Doc. 20)**

This civil action is before the Court on Defendants' Motion for Summary

Judgment (Doc. 20) and the parties' responsive memoranda (Docs. 29, 31).

## I.  STATEMENT OF THE CASE

Plaintiff Ersin Deger alleges that Defendants unlawfully discriminated against him

based on his national origin and religion in violation of Title VII and 42 U.S.C. § 1983.[1]

Plaintiff was originally hired by UC Clermont as an Assistant Professor of Mathematics

in 2009.  However, the position could not support Plaintiff's application for permanent

residency because it was not advertised in compliance with relevant federal regulations.

UC Clermont subsequently re-advertised the position and conducted a nationwide search

to fill the position.  Plaintiff was selected as a finalist, but another candidate was offered

the position. Plaintiff alleges that he was not selected for the position because two

---

[1] Defendants include the University of Cincinnati, Clermont College, Dean Gregory Sojka,
Professor Ian Clough, and Professor Margaret Hager.

members of the search committee harbored discriminatory biases against him based on

his national origin and religion.

## II.    UNDISPUTED FACTS

1.  Plaintiff Ersin Deger is a resident of Istanbul, Turkey, and obtained an undergraduate degree from Bilkent University in Ankara, Turkey in 1996. (Doc. 13 at 6-7).

2.  After obtaining a student visa to enter the United States, Plaintiff began attending the University of Minnesota in 1997 for a Master's degree in Mathematics, which he completed in 2000.  (*Id.* at 8-10).

3.  With his student visa, Plaintiff enrolled in a Ph.D. program in Mathematics at Purdue University, and remained in the United States on a student visa until he obtained his Ph.D. from Purdue University in 2007.  (*Id.* at 8-13).

4.  Plaintiff worked as a student teacher as part of his Ph.D. program at Purdue, and in late 2006, as he approached obtaining his Ph.D. in Mathematics, he began applying for academic positions at universities and colleges in the U.S.  (*Id.* at 16-17).

5.  Plaintiff did not take any steps toward obtaining a green card for permanent U.S. residency while he was present on a student visa, and, instead, focused on obtaining an academic position at a university.  (*Id.* at 19-20).

6.  Plaintiff understood that he was personally responsible for obtaining a green card, but hoped that by obtaining a tenure-track position with a university, the university would apply for a green card on his behalf.  (*Id.* at 20).

7.  Plaintiff did not obtain a tenure-track position in 2007, but instead accepted a position as a Visiting Assistant Professor at the University of Cincinnati's main campus in Clifton beginning in September 2007.  (*Id.* at 22).

8.  For the first year following his Ph.D., Plaintiff extended his student visa under optional training status.  (*Id.* at 26).

9.  Plaintiff worked as a visiting professor of mathematics at UC's Clifton campus from September 2007 until the summer of 2009.  (*Id.* at 22).

10. In 2008, Plaintiff obtained an H1B work visa that would allow him to maintain residency in the United States for up to six years on a worker's visa.  (*Id.* at 27).

11. Plaintiff understood that he needed a tenure-track or permanent position to support an application for a green card. (*Id.*)

12. Plaintiff did not apply for a private sector job because he believed that his Ph.D. and background in pure mathematics limited his employment opportunities to academic jobs at colleges or universities. (*Id.* at 28).

13. In 2009, Plaintiff applied for a tenure-track position as an Assistant Professor of Mathematics at UC Clermont College. (*Id.* at 29-30).

14. After his application in 2009, Plaintiff had a telephone interview and an on-campus interview with the search committee at UC Clermont, and Plaintiff conducted a teaching demonstration. (*Id.* at 32-35).

15. The search committee consisted of UC Clermont Mathematics Professors Defendant Ian Clough, Defendant Margaret "Peggy" Hager, Michael Vislocky, Teri Rysz, and Kate Lane. (*Id.* at 32-33, Ex. 3).

16. Defendant Clough was the chair of the search committee, and Plaintiff remembered that Defendant Clough spoke the most during the telephone interview. (*Id.* at 34, 37).

17. The search committee recommended that Plaintiff be offered the position of Assistant Professor of Mathematics. (*Id.*, Ex. 3).

18. On August 13, 2009, interim Dean James McDonough and interim division chair William Gay offered Plaintiff the position at UC Clermont. (*Id.*, Ex. 4).

19. As an Assistant Professor, Plaintiff received an initial appointment of three years, from September 2009 to August 2012. (*Id.*)

20. The appointment was made in accordance with Article 6 of the collective bargaining agreement between the University of Cincinnati and the American Association of University Professors ("AAUP"). (*Id.*)

21. Pursuant to the CBA, Plaintiff was eligible for reappointment in 2011 to another two-year term. (*Id.*, Ex. 5 at 4).

22. Under the CBA, an Assistant Professor could serve a maximum of seven years without obtaining tenure and professors would generally leave their employment at the College if they did not obtain tenure in that time. (*Id.* at 60, Ex. 5 at 4)

23. Plaintiff renewed his HIB visa in 2010 based on his position with UC Clermont. (*Id.* at 49-50).

24.    After his initial appointment, Plaintiff began to familiarize himself with the reappointment process, and understood that the process was governed by both the collective bargaining agreement and UC Clermont's policy on reappointment and tenure.  (*Id.* at 50-52, Ex. 5).

25.    Faculty members were evaluated for reappointment based on teaching effectiveness, professional activity, and institutional and community service.  (*Id.*, Ex. 5 at 1-3).  The written guidelines state that teaching effectiveness was the "primary consideration for any recommendation."  (*Id.* at 1).

26.    Professional activity included publishing papers, presenting papers at professional meetings, participating in conferences, and giving lectures.  Service encompassed internal services such as committee work and advisement, as well as external service such as charitable work.  (*Id.* at 2-3).

27.    Faculty receive ratings of satisfactory, substantial, or excellent in each area.  (*Id.* at 4).

28.    An application for reappointment is first reviewed by the Department Reappointment, Promotion, and Tenure Committee, then the Department Chair, then the UC Clermont Reappointment, Promotion, and Tenure Committee, the Dean of UC Clermont, and finally the University Provost.  (*Id.* at 3).

29.    On June 21, 2011, Defendant Gregory Sojka, the Dean of UC Clermont, prepared a memorandum to UC Provost Santa Ono, recommending Plaintiff for a two-year reappointment effective September 1, 2012.  (*Id.*, Ex. 6).

30.    Defendant Sojka rated Plaintiff's teaching effectiveness as substantial, and his professional activity and institutional and community service as satisfactory with room for improvement in both areas.  (*Id.*)

31.    In the area of professional activity, Defendant Sojka indicated that Plaintiff would submit a dissertation-based paper for publication and that his 2007 dissertation had the potential for additional publications.  Defendant Sojka recommended that Plaintiff pursue reviews of these papers for publication.  (*Id.*)

32.    In 2010, Plaintiff asked Defendant Hager, Dr. Lane, and Dr. Rysz to sit in on a class he taught in order to provide peer review feedback and analysis on his teaching.  (*Id.* at 86, 90-92; Doc. 16 at 8-9).

33.    Sometime in 2010, Plaintiff began inquiring about the green card process with secretaries of the Math, Computers, Geology and Physics ("MCGP") Department at UC Clermont.  (Doc. 13 at 105-06).

4

34. Plaintiff also inquired about a green card application with Debbie Jones at the UC Clifton International Students and Scholars Office.  (*Id.* at 106-07).

35. As a result of conversations with Debbie Jones, Plaintiff learned that his initial hiring could not support his application for a green card and permanent residency in the United States because the position was not advertised in a national print journal.  (*Id.* at 111-12).

36. Two other foreign national professors at UC Clermont encountered the same issue and their employment also could not support a green card application.  (*Id.* at 113).

37. UC Clermont agreed to re-advertise these positions in a way that would support a national applicant pool, and could then form the basis for UC Clermont to support a Labor Certification Application consistent with the U.S. Department of Labor's rules.  (*Id.* at 112-15, 142-43).

38. Plaintiff understood that these requirements for a green card application came exclusively from the U.S. Government.  (*Id.* at 142).

39. Plaintiff knew that UC Clermont was advertising this position so that it could support his green card application, and that it required a legitimate search and selection process that would see Plaintiff selected only if he was the most qualified candidate.  (*Id.* at 142-43).

40. Plaintiff understood that he would not receive any special preference during the search process.  (*Id.*)

41. The other mathematics faculty members were generally aware of Plaintiff's status as a foreign national, and his need to "reapply" to support a green card application. For instance, Rysz recalled there was some problem with the way the position was originally posted that Plaintiff had applied for and been awarded.  (Doc. 16 at 13).

42. Dr. Lane encouraged Plaintiff to ensure that his application was "the best that it can be."  (Doc. 13 at 120, Ex. 7).

43. The position was advertised in seven different publications in both online and print between January 12, 2012 and January 27, 2012.  (*Id.*, Ex. 9).

44. Plaintiff submitted his application for the position in February 2012.  (*Id.* at 119-20).

45. Plaintiff listed his references as Dr. Steven Bell and Dr. Rita Saerens from Purdue, Pat McSwiggen from UC Clifton, and Defendant Clough.  (*Id.* at 121-23, 154).

46.  Plaintiff could not recall speaking with Defendant Clough before listing him as a reference.  (*Id.* at 121-22).

47.  Plaintiff knew that Defendant Clough, in his role as Department Chair, had reviewed Plaintiff's reappointment folder in 2011 and knew him on a personal basis from work in the department and would be able to provide an "objective and good" reference.  (*Id.*)

48.  At the start of a search committee process, Defendant Sojka would usually attend a training conducted by a UC Equal Opportunity Officer with all of the members of that search committee.  (Doc. 17 at 13).

49.  Defendant Sojka always charged a search committee with finding the best candidates.  (*Id.* at 16).

50.  Diversity is a general goal and the EEO discusses ideas for how to advertise to obtain a diverse candidate pool.  (*Id.* at 14-15).

51.  UC Clermont conducted two searches in spring 2012, one for the tenure-track Assistant Professor position that Plaintiff applied for and the other for a non-tenure track educator position.  (Doc. 19 at 8-9).

52.  Defendant Clough asked Dr. Lane to chair the search committee for the tenure-track position.  (*Id.* at 9-12).

53.  The remaining search committee members were Mathematics professors Teri Rysz, Defendant Hager, and Girija Nair-Hart, as well as Science professor Cliff Larrabee.  (Doc. 13, Ex. 9).

54.  Rysz volunteered for the search committee for the tenure-track position because it provided an opportunity to demonstrate internal service to UC Clermont as part of her own upcoming reapplication review.  (Doc. 16 at 12).

55.  Defendant Hager, a tenured professor, also volunteered for the search committee and felt that most full-time faculty are often asked to sit on search committees.  (Doc. 14 at 8).

56.  Defendant Hager agreed that it was slightly unusual situation to have an internal candidate like Plaintiff reapply for a position he had already held.  (*Id.* at 49-50).

57.  Larrabee, a science professor, was on the search committee to provide input from someone outside the mathematics discipline.  (Doc. 16 at 15).

58. Dr. Rysz spoke with Dr. Lane about leaving the search committee because she had "too much on her plate," but ultimately decided to stay on the committee.  (*Id.* at 32-33).

59. Twenty-seven candidates applied for the position, from which the search committee unanimously selected eight applicants for telephone interviews and three finalists for on-campus interviews.  (Doc. 13, Ex. 9 at 1; Doc. 19 at 31-32).

60. The committee actually selected a fourth candidate for an on-campus interview, but he was later removed when it was determined that his degree in Computer Science could not be considered a degree in Mathematics.  (Doc. 13, Ex. 9 at 1-2).

61. Dr. Lane spoke with Pamela Hamm, an associate in Defendant Sojka's office, for clarification on whether the search committee should communicate the committee's top choice to the Dean, Defendant Sojka,.  (Doc. 19 at 60).

62. Hamm indicated that each member of the search committee should provide a written evaluation of each candidate and should not rank the candidates.  (*Id.* at 60).

63. Informally, Dr. Lane had already shared with Plaintiff that she was concerned about accusations of bias for or against Plaintiff, depending on the result of the search. (*Id.* at 50).

64. Dr. Lane testified that she is confident that her concerns about bias did not affect her performance as Chair of the search committee.  (*Id.*)

65. Dr. Rysz testified that she never felt pressured by Dr. Hager to write negative comments about Plaintiff.  (Doc. 16 at 31).[2]

66. Defendant Hager testified that she never encouraged Dr. Rysz to write negatively about Plaintiff.  (Doc. 14 at 20).

67. Defendant Hager observed Plaintiff teaching a class in 2010 for a peer review and while her evaluation of his classroom teaching was generally positive, Defendant Hager noted that Plaintiff tended to speak to the board and did not have a lot of class interaction until the end of the class period.  (*Id.* at 23).

68. Defendant Hager thought Jonathan Clark's teaching demonstration was very well done and she supported Clark receiving the appointment over Plaintiff.  (*Id.* at 35).

69. Defendant Hager testified that she did not know Plaintiff was from Turkey before this action was filed.  (*Id.* at 37).

---

[2] Plaintiff attempts to create a material factual dispute through inadmissible hearsay.

70. Defendant Hager testified that she never discussed Plaintiff's country of origin with search committee members. (*Id.*)

71. Defendant Hager recognized there were differences of opinion among the search committee members about who was the best candidate. (*Id.* at 40).

72. Dr. Lane was satisfied that each finalist was evaluated based upon the evidence that was available. (Doc. 19 at 53).

73. Dr. Lane never observed Dr. Nair-Hart accuse Dr. Hager of trying to unfairly prejudice the search process. (*Id.*)

74. Dr. Nair-Hart accused Dr. Hager of "not liking Ersin and being against him" and Dr. Hager accused Dr. Nair-Hart of the opposite. (*Id.* at 54).

75. Dr. Lane observed neither Dr. Nair-Hart nor Dr. Hager express a concern that either was attempting to influence other members of the search committee. (*Id.*)

76. Dr. Lane also recalled Dr. Nair-Hart mentioning that some faculty had criticized Plaintiff for not attending as many faculty meetings as he should have. (*Id.* at 38).

77. Dr. Lane said that should not be part of the process for the search committee to consider. (*Id.* at 38-39).

78. The only communication Dr. Lane had with Defendant Sojka during the search process was forwarding the references and submitting the search committee's final report. (Doc. 17, Ex. F; Doc. 19 at 40).

79. Dr. Lane never spoke with Dean Sojka about the finalists. (Doc. 19 at 49).

80. Dr. Lane also never spoke with Defendant Clough about preferences or a ranking of the finalists. (*Id.* at 49).

81. In an email to Defendant Sojka on June 1, 2012, Dr. Lane wrote:

> I have attached three files, one for each of our candidates, that contain the references. In the past we have conducted the reference checks by phone. I chose to do this differently this year given the sensitivity of the search. In our committee meetings I felt there were subtle accusations of different members being either biased for or against particular members. At one point a member began questioning wether [*sic*] or not all committee members were being fair to all candidates. Therefore, as a way to protect myself from being accused of misrepresenting what a reference might have said, I asked the references to respond in writing to a document with

> questions that normally would be asked over the phone.  I shared the documents with each member of the committee.

(Doc. 17, Ex. F).

82.   Dr. Lane testified that she used the word "sensitivity" in the email because Plaintiff was an internal candidate.  (Doc. 19 at 40-41).

83.   Dr. Lane testified that <u>if</u> she had observed any actions by search committee members that led her to believe they were acting on some known or unknown bias, she would have raised her concerns that with the committee member.  (*Id.* at 59).

84.   Dr. Rysz never spoke with Dean Sojka about the search.  (Doc. 16 at 17, 36).

85.   Dr. Lane never heard any members of the search committee make any comments about the national origin, religion or ethnicity of the candidates.  (Doc. 19 at 55).

86.   Dr. Lane never observed anything that suggested to her that any members of the committee were biased against Plaintiff because of his national origin, religion or ethnicity.  (*Id.* at 55-56).

87.   Defendant Sojka received the search committee's report and reviewed Dr. Lane's email about how she handled references with written questions and email responses instead of telephone interviews.  (Doc. 13, Ex. 9; Doc. 17 at 72-73, Ex. F).

88.   Defendant Sojka testified that he believed Dr. Lane had adequately addressed the concern about bias by presenting the questions and responses from references in writing.  (Doc. 17 at 72-73).

89.   Defendant Sojka interviewed each of the three finalists during the on-campus interview process.  (*Id.* at 10).

90.   Defendant Sojka has no background in mathematics, but in interviews would question the finalists about success in teaching and their approach to teaching, as well as research and scholarship and service to the college or university where they worked.  (*Id.*)

91.   Defendant Sojka did not attend the teaching demonstrations and did not ask interview question about mathematics competencies.  (*Id.* at 10-11).

92.   Dean Sojka reviewed the search committee's report and looked at how the search committee evaluated the teaching demonstration as one factor in a group of factors, although he did testify that he placed more weight on teaching effectiveness than the research and service factors.  (*Id.* at 19, 21).

93.   Dean Sojka testified that the Department Chair does not typically serve on the search committee, but does attend teaching demonstrations because the Department Chair has a long-term responsibility to evaluate all of the faculty in their area and so is interested in whether the candidate has a good chance of long-term success. (*Id.* at 25).

94.   Defendant Sojka as Dean of UC Clermont was the final decision maker for the position.  (*Id.* at 28).

95.   Defendant Sojka did not speak individually with any members of the search committee about the search.  (*Id.* at 58).

96.   Defendant Sojka reviewed Defendant Clough's reference for Plaintiff and considered it "lukewarm" and "not a strong affirmative reference."  (Doc. 13, Ex. 8; Doc. 17 at 44, 54).

97.   Defendant Clough did write a reference for Plaintiff, and answered the emailed questions like the other references, but it was unusual for a department chair to write a reference for an internal candidate.  (Doc. 18 at 35).

98.   Although Defendant Clough thought it was an awkward situation, since Plaintiff put him down as a reference, he thought it was "okay" to respond to the questions from the search committee.  (*Id.* at 36).

99.   Defendant Sojka did not have any previous knowledge of Jonathan Clark or Levi Molenje, the other finalists, but did have prior knowledge of Plaintiff's work, primarily through the reappointment process.  (Doc. 17 at 32-33).

100.  Dean Sojka recalled that Jonathan Clark had previously taught at Southern State Community College, which was an environment more similar to UC Clermont than Auburn University, where Clark was then teaching as a graduate teaching assistant.  (*Id.* at 57, Ex. C).

101.  Defendant Sojka considered Plaintiff's 2011 reappointment letter as part of Plaintiff's 2012 application.  (*Id.* at 38).

102.  The reappointment letter had rated Plaintiff's teaching effectiveness as substantial, but noted concerns in the areas of professional activity and institutional service. (Doc. 13, Ex. 6; Doc. 17 at 61-62).

103.  Dean Sojka did speak with Defendant Clough about the three finalists.  (Doc. 17 at 29).

104.  Defendant Sojka did not recall hearing any negative comments from Defendant Clough about Plaintiff from the 2011 reappointment process.  (*Id.* at 33).

105. Although UC Clermont's Recruitment and Search Guide provides that the search committee must rank the candidates (Doc. 19, Ex. A at 22), Defendant Clough testified that in his experience with several different deans at UC Clermont that they did not want a ranking of finalists. (Doc. 18 at 26).

106. Defendant Sojka noted that one of the finalists, Levi Molenje, had been late for his interview and the committee members had not looked favorably upon this fact. (*Id.* at 27).

107. Defendant Clough told Defendant Sojka that he would not have a problem with any of three candidates joining the Mathematics department. (*Id.* at 29).

108. Defendant Clough remembered Defendant Sojka saying the interview with Jonathan Clark went well and that Defendant Sojka was impressed with Jonathan Clark, whom he thought had great potential. (*Id.* at 30).

109. When Defendant Sojka spoke with Clough, he asked for input on all three finalists; as to Plaintiff, he thinks that Clough probably echoed the reference that Plaintiff did a good job in the classroom but needed to enhance his service to the College and be more involved in scholarship. (Doc. 17 at 50).

110. Defendant Sojka felt that Plaintiff did not "shine" in the areas of service or professional activity. (*Id.* at 46-47).

111. Defendant Sojka testified that he viewed Jonathan Clark as the most qualified candidate and that Clark had more long-term growth potential. (*Id.* at 50-51).

112. On July 9, 2012, Defendant Sojka met with Plaintiff to inform him that the tenure-track position was awarded to another finalist. (Doc. 13 at 146-47, 216-17, Ex. 12).

113. There was no discussion of Plaintiff's religion or national origin during this meeting, and Plaintiff could not recall ever discussing his religion or the fact that he was from Turkey with Defendant Sojka. (*Id.* at 148).

114. At this point, Plaintiff was concerned that UC Clermont would not honor his two-year reappointment, and Plaintiff spoke with some other faculty members and then union representatives from AAUP. (*Id.* at 218-19, Ex. 13).

115. An AAUP representative, Eric Palmer, contacted Vice Provost of Academic Affairs John Bryan. (*Id.*, Ex. 14).

116. Plaintiff fulfilled the two years of his reappointment in a mathematics position at UC Blue Ash instead of UC Clermont. (*Id.*)

117. Plaintiff applied for a tenure-track mathematics position at UC Blue Ash in fall 2012, but that search failed without hiring a candidate. (*Id.* at 227).

118. Plaintiff did not apply for a tenure-track mathematics position at UC Blue Ash that opened in spring 2013 because of his expiring H1B VISA and the lack of a practical way to keep his employment in the United States. (*Id.* at 232).

### III.    ANALYSIS

Plaintiff alleges that impermissible national origin and religious discrimination caused Defendants to select a less qualified candidate during the 2012 search process. Plaintiff does not challenge the manner in which the 2009 position was advertised nor the requirement that he apply for the re-advertised position. Rather, Plaintiff frames his case solely as a failure-to-hire claim based on his unsuccessful 2012 application.

Plaintiff concedes that Defendant Sojka had no discriminatory animus, but seeks to impose liability on UC Clermont and the three individual Defendants based on the cat's paw theory of liability. (Doc. 29 at 17). The cat's paw theory of liability is that "a biased subordinate, who lacks decision-making power, influence[d] the unbiased decision-maker to make an adverse employment decision, thereby hiding the subordinate's discriminatory intent." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 755 (6th Cir. 2012). There must be evidence of a "'causal nexus' between the ultimate decisionmaker's decision to terminate the plaintiff and the supervisor's discriminatory animus." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 836 (6th Cir. 2012) (quoting *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008)). According to Plaintiff, Defendants Clough and Hager were the biased subordinates who influenced Defendant Sojka, the unbiased decision maker.

To establish a *prima facie* case of discrimination based on failure to hire, Plaintiff must offer evidence that (1) he is a member of a protected class, (2) he applied and was qualified for a job for which the employer was seeking applicants, (3) he was not selected, and (4) a person outside the protected class was hired. *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000). It is undisputed that Plaintiff's Turkish national origin and Muslim religion made him a member of a protected class. Although Defendants argue that they had no knowledge of Plaintiff's national origin or religion, Defendants cite no case law indicating that knowledge is an element of the prima facie case under Title VII. Defendants also attempt to argue that Plaintiff did not suffer an adverse employment action because he was allowed to complete his two-year reappointment at UC Blue Ash. However, it is clear that Plaintiff applied for a tenure-track position at UC Clermont that would support his application for permanent residency, he was not hired, and that another candidate outside the protected class was selected. Accordingly, Plaintiff has established his *prima facie* case.

At this point, the burden shifts to Defendants to identify a legitimate, nondiscriminatory reason for selecting Clark for the position. *Romans*, 668 F.3d at 838-39. Defendants submit that Defendant Sojka found that Plaintiff's application was not impressive, included references that were dated and lukewarm, and noted that Plaintiff had not consulted with Defendant Clough before listing him as a reference. Defendant Sojka was impressed with Clark's communication skills and thought he had room to grow into the tenure-track position. This satisfies Defendants' burden to articulate a legitimate, nondiscriminatory reason.

Plaintiff may show that this legitimate, nondiscriminatory reason is pretext for discrimination by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the employer's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Clay v. UPS*, 501 F.3d 695, 704 (6th Cir. 2007). The Sixth Circuit has counseled against formulaic application of these categories and has stressed that they serve only as a tool to assist in the court in addressing the ultimate inquiry of "whether the employer made up its stated reason to conceal intentional discrimination." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2008).

An employer may avoid a finding that its proffered nondiscriminatory reason was pretextual by invoking the honest belief rule. This requires the employer to "establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). In determining whether an employer reasonably relied on the particularized facts then before it, courts "do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006). "As long as the employer held an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Seeger v. Cincinnati Bell Tele. Co.*, 681 F.3d 274, 285-86 (6th Cir. 2012).

To prove pretext, the employee must allege "more than a dispute over the facts upon which the [hiring decision] was based. He must put forth evidence which

demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001). If the employee is able to "produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Smith*, 155 F.3d at 807-08. The employee may make this showing by, for example, demonstrating "an error on the part of the employer that is too obvious to be unintentional." *Seeger*, 681 F.3d at 286.

Plaintiff argues that Defendants' proffered reason is pretext because it is highly subjective, Plaintiff was better qualified than Clark, Defendants Clough and Hager made numerous comments evidencing bias, and the search committee did not follow the guidelines for the selection process. Under the unusual factual circumstances in this failure-to-hire case, Plaintiff is unable to offer evidence that the selection of Clark was pretext for unlawful discrimination. Additionally, Plaintiff is unable to demonstrate the necessary causal nexus for cat's paw liability.

Plaintiff first contends that Defendants' proffered reason is highly subjective and insufficient to justify the hiring decision. However, the subjective criteria that Plaintiff identifies are impressions drawn exclusively by Defendant Sojka, whom Plaintiff has absolved of harboring a discriminatory bias. Specifically, Defendant Sojka was impressed with Clark's communication skills after the interview and felt that Clark could grow into the tenure-track position. Defendant Sojka also felt that Plaintiff's references

were dated and lukewarm.  Plaintiff has not presented any evidence to suggest that these reasons were an attempt to conceal discrimination.  Additionally, Plaintiff there is no basis for cat's paw liability with respect to these reasons.  Defendant Clough's written reference was submitted in the record, and Plaintiff advances no grounds to suggest that it reflects anything other than an honest evaluation.  (Doc. 13, Ex. 8).  It is true that Plaintiff had to submit outdated references for reasons outside his control.  However, that misfortune is attributable to the need to re-advertise the position, not to any discriminatory bias by Defendants.

Plaintiff next argues that he was objectively more qualified for the position than Clark because Plaintiff had five years of post-doctoral teaching experience and had one publication.  Clark had yet to receive his Ph.D. at the time he received the offer and had no publications.  Because Plaintiff is able to identify little or no probative evidence of discrimination, the Court must apply the rule that "evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual."  *Bender v. Hechts Dep't Stores*, 455 F.3d 612, 628 (6th Cir. 2006).  Accordingly, Plaintiff must establish that his qualifications were "so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former."  *Id.*  Plaintiff is unable to satisfy this heavy burden.

Plaintiff's attempt to show pretext through allegedly discriminatory comments is similarly unavailing.  Plaintiff attributes a number of statements to Defendants Clough

and Hager that he alleges show that they were biased against Plaintiff. (Doc. 29 at 23-24). Assuming that these statements are true, and are not inadmissible hearsay,[3] the statements do not reflect unlawful discriminatory bias based on Plaintiff's national origin or religion. Even if the Court assumes that Defendants Clough and Hager were biased against Plaintiff's candidacy, Plaintiff offers no evidence for a reasonable jury to conclude that the bias was based on unlawful factors and not on permissible reasons to oppose his candidacy, such as displeasure with Plaintiff's ability as a math professor.

The final circumstance that Plaintiff claims demonstrates pretext is the fact that the search committee did not rank the candidates as required by the relevant guidelines for the search process. It is undisputed that the decision that each search committee member would provide a written evaluation of the candidates in lieu of ranking the candidates was made by the search committee chair Dr. Lane in consultation with Pamela Hamm, the assistant to the Dean. (Doc. 19 at 60). This was taken in response to Dr. Nair-Hart's complaints about bias and was intended to increase transparency. Dr. Lane also deviated from the search process guidelines by requiring that references submit written responses instead of speaking to search committee members on the phone. Dr. Lane took this step to ensure that she could not be accused of misrepresenting a response.

---

[3] A number of the alleged statements that Plaintiff lists are likely inadmissible hearsay. For example, Plaintiff attempts to introduce statements made by Dr. Lane or Dr. Rysz through the deposition testimony of Karla Phillips. Dr. Lane and Dr. Rysz were both deposed, but Plaintiff does not cite to their own deposition testimony. Additionally, Plaintiff alleges that Dr. Rysz attempted to quit the search committee because of biased comments that Defendant Hager made and cites to Dr. Lane's deposition. (Doc. 19 at 16-18). At her own deposition, Dr. Rysz specifically denied making this statement to Dr. Lane and testified that she attempted to resign from the search committee because of her busy schedule. (Doc. 16 at 32-33).

(Doc. 17, Ex. F).  Plaintiff does not argue that either Defendant Clough or Hager influenced Dr. Lane's decision.

It is undisputed that Defendant Sojka did not speak with any members of the search committee about the candidates, including Defendant Hager, and the members of the search committee only expressed their opinions about the candidates in the written committee report.  (Doc. 17 at 58).  Each of the five search committee members wrote a narrative assessment of the three candidates.  (Doc. 13, Ex. 9).  Plaintiff alleges that Defendant Hager made a number of verbal comments to other committee members that were indicative of a discriminatory bias.  However, it is undisputed that these comments were not reflected in the written report.  Plaintiff also contends that Defendant Hager falsely stated in the committee report that Plaintiff worked out the first example of his teaching demonstration with his back to the class.  (*Id.* at 6).  Dr. Nair-Hart directly contradicted this statement in her portion of the committee report and indicated that Plaintiff had faced the class for his entire teaching demonstration.  (*Id.* at 7).  Even if the Court assumes that Defendant Hager's statement was false, and that it was made with discriminatory intent, there is nothing to suggest that a contradicted statement in the committee report regarding one example during the teaching demonstration proximately caused Defendant Sojka to select Clark instead of Plaintiff.  *Bobo*, 665 F.3d at 755.  Accordingly, Plaintiff is unable to offer any evidence probative of pretext and cannot establish the causal nexus for cat's paw liability.

## IV.    CONCLUSION

Wherefore, for these reasons, Defendants' Motion for Summary Judgment (Doc. 20) is hereby **GRANTED**.  The Clerk shall enter judgment accordingly, whereupon this civil action is **TERMINATED** on the Court's docket.

**IT IS SO ORDERED**.

Date:    _____9/30/15_____          ____*s/ Timothy S. Black*_____
                                            Timothy S. Black
                                            United States District Judge